IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| **Christopher Dudley,** <br> Petitioner, <br> <br> v. <br> <br> **Chadwick Dotson,** <br> Respondent. | ) <br> ) <br> ) <br> )  No. 1:24cv451 (RDA/WBP) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION

Christopher Dudley ("Petitioner" or "Dudley"), a Virginia state prisoner, proceeding *pro se*, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging his term of confinement has been lengthened due to the respondent's application of the 2022 amendments to the Earned Sentence Credit ("ESC") system in a manner that violates the Equal Protection, Due Process, and *Ex Post Facto* Clauses. Dkts. 1, 2. On September 9, 2024, Respondent filed a Rule 5 Answer and Motion to Dismiss, and submitted a brief in support with an affidavit. Dkts. 13-15. Petitioner was advised of his right to respond in accordance with *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) and Local Rule 7(K), Dkt. 16, but he did not respond. On March 28, 2025, after reviewing the pleadings, the Court directed Respondent to file a supplemental response to explain in greater detail "how ESC credits have been recalculated and applied to Petitioner's ESC-1 and ESC-2 sentences . . . to determine if the recalculations in any way prejudiced Petitioner." Dkt. 18 at 1. The March 28, 2025 order also advised Petitioner, in accordance with *Roseboro,* that he had a right to respond to the supplemental response. Petitioner has not responded. Accordingly, this matter is now ripe for disposition. For the reasons that follow, the respondent's Motion to Dismiss must be granted and the petition will be dismissed with prejudice.

## I. Background

On May 17, 2011, Dudley pleaded nolo contendere to first-degree murder and concealing a dead body in the Circuit Court for Bedford County, Virginia. Dkt. No. 15-1 at 11-12. The Court sentenced Dudley that same day to 60 years in prison, with 28 years suspended, for first-degree murder (offense date, February 14, 2011) in violation of Virginia Code § 18.2-32; and 5 years in prison for concealing a dead body (offense date, February 1, 2014) in violation of Virginia Code § 18.2-323.02. Dkt. 15-1 at 11-12. The final judgment order was entered on May 19, 2011, and Dudley did not appeal. The Virgina Supreme Court dismissed his subsequent petition for a writ of habeas corpus, in which Dudley raised claims related to the 2022 amendments to the ECS system on January 24, 2024. *Christopher M. Dudley v. Harold W. Clarke, Director of VA. D.O.C.*, No. 220799. The court found it did not have jurisdiction and dismissed the petition without addressing the merits of Dudley's claims regarding the amendments to the ESC system.

Dudley's Custody Responsible Date ("CRD") with the Virginia Department of Corrections ("VDOC") is July 18, 2011. He was credited with 489 jail credit days, and an additional 2.25 days' credit for every 30 days served on his ESC sentences for the time he spent in jail awaiting adjudication of his criminal charges. Dkt. 15-1 at 5-6. Because Dudley's felony offenses were committed after January 1, 1995, he was not eligible for parole, Virginia Code § 53.1-165.1, but he continued to earn sentence credits under the ESC system. Va. Code Ann. 53.1-202.2 through 202.4. On July 18, 2011, Dudley was assigned to ESC Class Level I[1] and began earning 4.5 days

---

[1] The ESC-1 system has four Class Levels at which ESC credits may be earned: in Class Level I, an inmate earns 4.5 days for every 30 days served; in Class Level II, an inmate earns 3 days for every 30 days served; in Class Level III, an inmate earns 1.5 days for every 30 days served; and in Class Level IV, an inmate earns 0 days for every 30 days served. Dkt. 15-1 at 13. On November 14, 2024, due to disciplinary infractions, Dudley was reduced to ESC-1 Class Level IV and was earning 0 days of ESC credits for every 30 days served. Dkt. 19 at ¶ 7 (affidavit dated April 28, 2025).

2

of ESC for every 30 days served on his felony sentences, the maximum prior to July 1, 2022. Dkt. 15-1 at 6.[2]

In 2020, the Virginia General Assembly revised the ESC system by amending Virginia Code § 53.1-202.3. The statutory amendments created a two-tier system pursuant to which a "maximum of 4.5 sentence credits may be earned for each 30 days served on a sentence" for certain enumerated offenses, including particular violent crimes and sex offenses, which included first-degree murder in violation of Code § 18.2-32. Va. Code Ann. § 53.1-202.3(A)(2). In contrast, inmates serving a sentence for "any offense other than those enumerated in subsection A," (hereinafter "non-enumerated offense") such as Code § 18.2-323.02, may earn as many as 7.5 or 15 days of ECS sentence credits for every 30 days served. Va. Code Ann. § 53.1-202.3(B); *see also Prease v. Clarke*, 888 S.E.2d 758, 759-60, 762 (Va. 2023) (describing the two-tier system created by the revised statutory scheme and finding that although an inmate convicted of violating Virginia Code § 18.2-31 (murder, Class 1 felony) "is ineligible to receive expanded earned sentence credits;" but an inmate convicted of attempted aggravated murder, which is a Class 2

---

[2] The ESC system allows inmates to earn sentence credits "through adherence to rules prescribed pursuant to § 53.1-25, through program participation as required by §§ 53.1-32.1 and 53.1-202.3, and by meeting such other requirements as may be established by law or regulation." Va. Code Ann. § 53.1-202.2. Good Time Release Dates ("GTRD") are projections "based on the assumption that the offender will continue to earn good time at the present earning level and will not have earned good time taken from the offender as a result of misbehavior. Loss of earned good time, a change in good time earning level, or any other event that impacts the service of the total sentence may cause the projected dates to change." Dkt. 19-1 at 25. During the course of this litigation, Dudley's projected GTRD changed on August 30, 2024, to October 6, 2042, Dkt. 15-1 at 17, and again on April 1, 2025, to March 1, 2045. Dkt. 19-1 at 25. The changes, as explained in the supplemental response, were due to Dudley's disciplinary infractions on October 29, 2024, refusal to submit to a drug test; and November 14, 2024, Refusal to Participate in or Removal from any Voluntary (non-reentry) program. The disciplinary offenses resulted in Dudley's loss of ESC credits and being reduced to Class Level IV in the ESC-1 program, which is "0 days" of ESC credit for every 30 days served. Dkt. 19-1 at ¶¶ 5-7. The changes in Class Level resulted in the recalculation of his projected good time release date on April 1, 2025, to March 1, 2045. *Id.* at 3, 25-26.

felony, is entitled to receive the expanded earned sentence credits because attempted aggravated murder is one of the enumerated offenses in § 53.1-202.3(A)).

"The implementation of this two-tiered system was delayed until July 1, 2022." *Prease*, 888 S.E.2d at 760 (citing 2020 Va. Acts, Spec. Sess. I, Ch. 50 (specifying that "the provisions of this act, other than the provisions of the second enactment of this act, shall become effective on July 1, 2022")). The 2020 legislation provided that the amended provisions of § 53.1-202.3 "shall apply retroactively to the entire sentence of any person who is confined in a state correctional facility and participating in the earned sentence credit system on July 1, 2022." 2020 Va. Acts, Spec. Sess. I, Ch. 50. Before the two-tiered system became effective on July 1, 2022, however, the Virginia General Assembly approved a biennial budget amendment (Amendment 19) proposed by the Governor that limited the ability of inmates serving sentences for both enumerated and non-enumerated offenses to earn enhanced sentence credits. The amendment, specifically Item 404(R)(2), provides as follows: "Notwithstanding the provisions of § 53.1-202.3, Code of Virginia, a maximum of 4.5 sentence credits may be earned for each 30 days served on a sentence that is concurrent with or consecutive to a sentence for a conviction of an offense enumerated in subsection A of § 53.1-202.3, Code of Virginia."[3] The budget provisions, including Item 404(R)(2), took effect on July 1, 2022 and remained in effect through June 30, 2024.

On July 1, 2024, the limiting language in Item 404(R)(2) was no longer in effect and the VDOC recalculated inmates', including Dudley's, projected release dates. Inmates with "mixed sentences"—*i.e.*, inmates with a term of incarceration that includes sentences listed in § 53.1-202.3 (A) and a sentence not listed in §53.1-202.3(A)—"will earn sentence credit under ESC-1 or ESC-

---

[3] *See Item 404(R)(2),* https://budget.lis.virginia.gov/item/2022/2/HB30/Chapter/1/404/ (last viewed May 29, 2025).

4

2 depending on the underlying offense of the sentence for which they are presently satisfying." Dkt. 15-1 at ¶ 22. Because Dudley is serving an ESC-1 sentence, with an active sentence of 32 years, he has been and will continue to earn ESC credits under the ESC-1 system. The VDOC projects[4] that Dudley will satisfy his ESC-1 sentence on March 31, 2040, at which time he will start serving his 5-year sentence, which will be under the ESC-2 system. Dkt. 19-1 at ¶ 4.

## II. Federal Petition

On March 14, 2024, Dudley, proceeding *pro se*, executed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, which was filed on March 20, 2024. He raises three claims:

I. "The petitioner incurred a substantial violation of the constitutional right to the due process and equal protection of the laws when the state retroactively amended the good time statute and intentionally excluded the petitioner while other similarly situated offenders obtained the benefits of that statute."

II. "The petitioner sustained a detrimental contravention of the constitutional right against cruel and unusual punishment, as prohibited by the 8th amendment, when the state retroactively amended the good time statute in violation of the *ex post facto* clause."

III. "The state's retroactive amendment of the good time statute that intentionally prevented the petitioner from earning the same credits as other offenders has increased my punishment [because it lengthens] my sentence and rendering that portion of my detainment unlawful and violative of my bedrock constitutional rights."

Dkt. 2 at 6.[5]

---

[4] *See, supra* at note 1.

[5] A district "court must consider claims as they are presented in the petition, reviewing them under the applicable standard" and it is "the district court's duty to consider only the specific claims raised in a § 2254 petition." *See Folkes v. Nelsen*, 34 F.4th 258, 269 (4th Cir. 2022) (citations omitted); *Frey v. Schuetzle*, 78 F.3d 359, 360–61 (8th Cir. 1996) ("[D]istrict courts must be careful to adjudicate only those claims upon which the petitioner seeks relief and take care not to decide claims upon which the habeas petitioner never intended to seek relief.").

## III. Standard of Review and Exhaustion

Because the Supreme Court of Virginia dismissed Dudley's state habeas petition based on the unavailability of state habeas relief, and not on the underlying merits, the Court's review is *de novo*. *See Winston v. Pearson*, 683 F.3d 489, 496 (4th Cir. 2012).[6]

## IV. Discussion

### A. Claim I, Equal Protection and Due Process Clauses

Dudley's equal protection claim can be summarized as follows: the 2020 Amendment violates his rights under the Equal Protection Clause because he is not entitled to the enhanced ESCs "that are available to other offenders due solely to the criminal offenses for which [he] was convicted[.]" Dkt. 2 at 8. The Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This "requirement 'does not take from the States all power of classification,' but 'keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.'" *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Pers. Adm'r v. Feeney*, 442 U.S. 256, 271 (1979), and *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). To prevail on an equal protection claim, a litigant "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Only if such a showing is made does "the court proceed[] to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*

Dudley's argument that "[e]very offender" in VDOC custody "has been convicted of a felony and sentenced to serve more than (1) year in prison" and therefore all VDOC inmates are

---

[6] The facts in this matter are not in dispute.

6

similarly situated is erroneous. Dkt. 2 at 8. Courts have long "recognized that violent felony offenders are not similarly situated to non-violent felony offenders." *Wimbush v. Youngkin*, No. 7:22cv640, 2023 WL 2505483, at *3 (W.D. Va. Mar. 14, 2023) (citing *Scott v. Dennison*, 739 F. Supp. 2d 342, 361 (W.D.N.Y. 2010) (collecting cases rejecting the proposition that violent and non-violent felony offenders are similarly situated); *United States v. Allen*, 41 F. App'x 630, 632 (4th Cir. 2002) (noting, in rejecting the defendant's challenge to the validity of his sentence, that a defendant with three prior convictions for violent felonies was "not similarly situated to every other defendant with three prior felony convictions")), *aff'd*, No. 23-6252, 2023 WL 5666209 (4th Cir. Sept. 1, 2023). The Western District recently summarily dismissed a similar challenge to the same 2022 amendments to Virginia Code § 53.1-202.3.

> The plaintiff's equal protection claim fails on the first facet of the constitutional standard. He complains that he is treated differently than inmates convicted of different types of felonies, thus admitting that he is not similarly situated to the group with which he is comparing himself. Virginia lawmakers decided to allow nonviolent offenders to earn good conduct time at a higher rate than offenders who had been convicted of certain crimes. Because these two groups are not similarly situated in all relevant respects, treating the groups differently does not offend equal protection principles.

*Jauregui-Balbuena v. Youngkin*, No. 7:22cv483, 2022 WL 17415003, at *1 (W.D. Va. Dec. 5, 2022) (discussing amendments to Virginia Code § 53.1-202.3). Dudley has not alleged that he is being treated differently from others with those with whom he is actually similarly situated and is "in all relevant respects alike." *Nordlinger*, 505 U.S. at 10.

Dudley is not similarly situated to inmates who are entitled to enhanced ESCs because, unlike those inmates, Dudley's current period of incarceration is for a conviction of a subsection (A) offense and thus he cannot earn the enhanced ESCs provided for under subsection (B). Dudley has not alleged that VDOC has treated him differently from any other inmates serving a sentence for a subsection (A) offense. Rather, the opposite is true—VDOC treats all Virginia inmates

7

convicted of first-degree murder, or any other offense enumerated in subsection (A), the same under the amendments to the ESC statutory scheme—those inmates earn ESCs at a maximum rate of 4.5 days per 30 days served. Dkt. 15-1 at 7-8. Therefore, Dudley's equal protection claim will be dismissed.

Moreover, assuming Dudley satisfied the first step of the equal protection analysis, his claim is still deficient because he cannot "overcome the presumption of rationality that applies to government classifications." *Hoglan v. Youngkin*, No. 7:22cv460, 2023 WL 5214122, at *5 (W.D. Va. Aug. 14, 2023) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008)). Dudley's argument—that "there is absolutely no relation" between the bifurcated ESC system "and any legitimate penal interests because an offender's class level is not premised on criminal convictions," has no merit, Dkt. 2 at 9, because he does not "allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Giarratano*, 521 F.3d at 304 (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)). Indeed, "courts have recognized that states have a legitimate interest in 'preventing the early release of serious offenders' and . . . denying inmates sentence credits 'based on their criminal record is rationally related to [that] interest.'" *Hoglan*, 2023 WL 5214122, at *5 (quoting *Conlogue v. Shinbaum*, 949 F.2d 378, 380 (11th Cir. 1991); citing *Wottlin v. Fleming*, 136 F.3d 1032, 1034-37 (5th Cir. 1998) (concluding that a Bureau of Prisons regulation did not violate the Equal Protection Clause by excluding from consideration for a sentence reduction those prisoners whose current conviction may be nonviolent, but who had a prior conviction for a violent offense)). *See Moss v. Clark*, 886 F.2d 686, 690 (4th Cir. 1989) (observing that "[t]he Supreme Court . . . has rejected the argument that 'good time' extended to one class of inmates within a jurisdiction must perforce be extended to all.") (discussing *In McGinnis v. Royster*, 410 U.S. 263 (1973)).

8

The Fourth Circuit rejected a similar equal protection argument in *Moss,* which alleged that the District of Columbia's Good Time Credits Act violated the Due Process Clause of the Fifth Amendment because "it award[ed] differing good time credits to two classes of inmates convicted of District of Columbia Code offenses on the sole basis of their assignment to a District of Columbia or federal correctional facility." 886 F.2d at 689. There, the court highlighted the government's interest in "efficient prison administration[,]" which provided "an additional justification for the challenged classification," because maintaining "two different good time schemes, one for District prisoners and one for all other prisoners, . . . would be administratively burdensome [for the Federal Bureau of Prisons]." *Id.* at 691-92.

The Virginia General Assembly's decision to bifurcate the ESC system to provide enhanced ESCs for inmates not convicted of certain enumerated offenses is rationally related to the furtherance of "a legitimate government interest" because it "could conceivably balance the goals of reducing prison populations, protecting public safety, and minimizing the administrative burdens imposed on the [VDOC]." *Hoglan,* 2023 WL 5214122, at *5.

Lastly, Dudley's contention that "[t]he particular criminal offenses that are identified under subsection (A) . . . are primarily incurred by members of . . . minority races[.]" Dkt. 2, at 8. To the extent Dudley argues that the 2020 Amendment violates the Equal Protection Clause because it discriminates based on race, the United States Supreme Court has held that if a law that is neutral on its face has an adverse effect on a minority group, the law violates the Equal Protection Clause and "may be unconstitutional if motivated by a discriminatory purpose." *Crawford v. Bd. of Educ. of City of Los Angeles,* 458 U.S. 527, 535-38 (1982); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). A litigant "need not show that

9

discriminatory purpose was the 'sole[]' or even a 'primary' motive for the legislation, just that it was 'a motivating factor.'" *N.C. State Conf of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (quoting *Arlington Heights*, 429 U.S. at 265-66).

The *Arlington Heights* decision provided the following factors as a guide for discerning discriminatory intent: (a) the disparate impact of the official action, (b) "[t]he historical background of the challenged decision," (c) "[t]he specific sequence of events leading up to the challenged decision," (d) "[d]epartures from the normal procedural sequence," and (e) "the legislative or administrative history." 429 U.S. at 266-68. Dudley's petition sets forth nothing but bare allegations that the bifurcation of offenses in the 2020 Amendment was "done intentionally by the legislature[,]" and that the ESC for subsection (A) offenses "are primarily incurred by members of the minority races[.]" Dkt. 2 at 8. Although the fact that a facially neutral law has disparate impact on a certain group is relevant to the equal protection analysis, *Arlington Heights*, 429 U.S. at 266, but disparate impact alone cannot by itself show discriminatory purpose:

> [W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.

*Washington v. Davis*, 426 U.S. 229, 242 (1976). "[T]he ultimate question remains: did the legislature enact a law 'because of,' and not 'in spite of,' its discriminatory effect." *McCrory*, 831 F.3d at 220 (quoting *Pers. Adm'r of Mass. v. Feeny*, 442 U.S. 256, 279 (1979)). *Washington* recognizes that evidence of disparate impact alone, though not irrelevant, is insufficient to justify an inference of invidious discriminatory purpose. 426 U.S. at 242. Here, Dudley has failed to plausibly plead that the amendment was enacted with discriminatory intent.

## B. Due Process Clause

A federal court may grant habeas relief from a state court judgment "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Due Process Clause of the Fourteenth Amendment provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. To maintain a due process claim, "a plaintiff must first show that he has a constitutionally protected liberty or property interest, and that he has been deprived of that protected interest by some form of state action." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988) (internal quotation marks and citations omitted). Without such a showing, "the question of what process is required and whether any provided could be adequate in the particular factual context is irrelevant, for the constitutional right to 'due process' is simply not implicated." *Id.*

Here, although Dudley asserts that the 2020 Amendment violates his due process rights, his petition makes only a few passing references to the Due Process Clause and does not set forth any facts or argument to suggest that he has been denied due process. *See* Dkt. 2 at 2, 6, 13. Such conclusory allegations fail to state a claim for denial of due process in violation of the Fourteenth Amendment. *See Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir. 1992) (bald assertions and conclusory allegations are insufficient to support habeas relief), *overruled on other grounds as recognized in Yeatts v. Angelone*, 166 F.3d 255, 261 n.4 (4th Cir. 1999); *see also United States v. Dyess*, 730 F.3d 354, 359-60 (4th Cir. 2013) (holding that the district court may disregard "vague and conclusory allegations" in habeas petitions and review only claims "supported by facts and argument").

"A liberty interest may arise from the Constitution itself or from an expectation or interest created by state laws or policies." *Burnette v. Fahey*, 687 F.3d 171, 181 (4th Cir. 2012) (internal quotation marks and citation omitted). It is well established that "the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison." *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974). Thus, to prevail, Dudley must establish that, under Virginia law, he is entitled to receive the enhanced ESCs. *Smith v. Ashcroft*, 295 F.3d 425, 429-30 (4th Cir. 2002) ("In order for a statute to create a vested liberty or property interest giving rise to procedural due process protection, it must confer more than a mere expectation . . . of a benefit. There must be entitlement to the benefit as directed by statute, and the statute must act to limit meaningfully the discretion of the decision-makers." (internal quotation marks and citation omitted)).

Virginia state inmates do not have a protected liberty interest in ESCs at a specific rate or level. *Dennis v. Clarke*, No. 3:15cv603, 2016 WL 4424956, at *6 (E.D. Va. Aug. 17, 2016) ("[I]t is well established that Virginia inmates do not enjoy a protected liberty interest in the rate at which they earn either Earned Sentence Credits or Good Conduct Allowances." (quoting *Sydnor v. Mahon*, No. 3:10cv780, 2012 WL 604039, at *4 (E.D. Va. Feb. 23, 2012)).[7] "[W]hile the Virginia Code and relevant VDOC regulations require prison officials to provide opportunities for inmates to earn GCA credits, they also give officials absolute discretion over GCA classification. . . .Thus, Virginia has not created a statutory or regulatory interest in a particular GCA classification." *Deblasio v. Johnson*, 128 F. Supp. 2d 315, 330 (E.D. Va. 2000);[8] *see also Sazynski v. Clarke*, No.

---

[7] The Good Conduct Allowance ("GCA") system pre-dates the ECS system, and the GCA system does "not apply to any sentence imposed upon a conviction of a felony offense committed on or after January 1, 1995." Va. Code Ann. § 53.1-202.1.

[8] *James v. Robinson*, 863 F. Supp. 275, 277-78 (E.D. Va. 1994) ("Inmates have no protected liberty interest in remaining in or being assigned to a particular good conduct allowance level."), *aff'd*, 45 F.3d 426 (4th Cir. 1994) (unpublished); *Ewell v. Murray*, 813 F. Supp. 1180, 1182-83 (W.D. Va. 1993) ("The due process clause does not create for a prison inmate a liberty

2:10cv156, 2011 WL 586973, at *3 (E.D. Va. Feb. 8, 2011) ("it is well established that a Virginia prisoner has no protected liberty interest in a particular ESC classification") (citations omitted); *Puranda v. Johnson*, No. 3:08cv687, 2009 WL 3175629, at *5 (E.D. Va. Sept. 30, 2009) (finding that Virginia inmate "has no protected liberty interest in a particular ESC classification") (citations omitted).

To be sure, state laws and regulations create a liberty interest entitled to federal constitutional due process protections only when they involve a statute change that "inevitably affect[s] the duration of" an inmate's period of incarceration. *Sandin v. Conner*, 515 U.S. 472, 487 (1995). However, "no constitutionally protected liberty interest is . . . created under the [statutory] regime [if] either the primary decisionmaker or any reviewing authority is authorized to override, as a matter of discretion, any classification suggested by application of the prescribed substantive criteria." *Mills v. Holmes*, 95 F. Supp. 3d 924, 933 (E.D. Va. 2015). Because Virginia's ESC system gives officials such discretion, whatever actions VDOC takes to adjust an inmate's ESC level, and thus their GTRD, does not "inevitably affect" the actual length of time an inmate will serve to create a protected liberty interest.

Regardless of the amendment, budget item revision, and subsequent lapse of the budget item revision to the ESC system, Dudley's sentence for first-degree murder in violation of Virginia Code § 18.2-32—an offense enumerated in subsection (A) of Va. Code Ann. § 53.1-202.3—has

---

interest in earning a certain number of good time credits."), *aff'd*, 11 F.3d 482 (4th Cir. 1993); *Holmes v. Cooper*, 872 F. Supp. 298, 302 (W.D. Va. 1995) ("The opportunity to earn good time credits is not a constitutionally established liberty interest."); *cf. Gaskins v. Johnson*, 443 F. Supp. 2d 800, 805 (E.D. Va. 2006) (even if an "infraction resulted in reducing the good-time credits he might earn in the future; it did not result in his losing any already-earned credits. This distinction is important because prisoners have no liberty interest in obtaining or retaining a specific prison classification level to allow them to obtain an early release.").

13

been calculated under ESC-1 since he entered VDOC custody.[9] And, Dudley has not alleged that VDOC revoked a "vested" sentence credit. Because Dudley cannot show that he has been deprived of a protected liberty interest, he fails to demonstrate a violation of his right to due process.

### C. Ex Post Facto Clause

Dudley also contends that the 2020 Amendment "retroactively amended the good time statute in violation of the *ex post facto* clause." Dkt. 2 at 6. The United States Constitution prohibits states from enacting *ex post facto* laws. U.S. Const. art. I, § 10, cl. 1 (providing that "[n]o state shall . . . pass any . . . *ex post facto* Law"). A statute violates the *Ex Post Facto* Clause if it "punishes as a crime an act previously committed, which was innocent when done; . . . makes more burdensome the punishment for a crime, after its commission, or . . . deprives one charged with [a] crime of any defense available according to law at the time when the act was committed[.]" *Collins v. Youngblood*, 497 U.S. 37, 42 (1990) (citation omitted). The "controlling inquiry" is whether retroactive application of the changed law creates a "sufficient risk of increasing the measure of punishment[.]" *Garner v. Jones*, 529 U.S. 244, 250 (2000) (quoting *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 509 (1995)).

Courts have applied the *Ex Post Facto* Clause to state statutes that seek to change sentence credit programs much like the ESC system in Virginia. Dudley cites two such cases—*Weaver v. Graham* 450 U.S. 24 (1981), and *Lynce v. Mathis,* 519 U.S. 433 (1997)—to support his argument that the 2020 Amendment violates the *Ex Post Facto* Clause. Dkt. 2 at 10. In *Weaver*, the Supreme Court held that a Florida law that reduced the availability of good time credits from the levels available at the time the inmate committed the offense "r[an] afoul of the prohibition against *ex*

---

[9] As noted, Dudley has not yet started serving his sentence for concealing a dead body. *See* Dkt. 19-1 at ¶ 4.

*post facto* laws" because "the new provision constricts the inmate's opportunity to earn early release, and thereby makes more onerous the punishment for crimes committed before its enactment." 450 U.S. at 35-36. In *Lynce*, the inmate had earned sentence credits that were included in the determination that he could be released from custody. Later, Florida "retroactively canceled" credits an inmate had earned, and the retroactive cancelling of the credits "resulted in his" being rearrested after his release and in his "prolonged . . . imprisonment." 519 U.S. at 446-47. Dudley's reliance on *Weaver* and *Lynce* is misplaced.

The 2020 Amendment, both facially and as applied to Dudley, does not violate the prohibition of *ex post facto* laws. It neither creates a new crime nor deprives Dudley of a previously existing defense. Further, it does not increase the possible punishment above what was permitted when Dudley committed the underlying offenses. The 2020 Amendment also does not reduce the amount of ESCs or the rate of accrual from the levels available when Dudley committed the underlying offenses. Lastly, it does not permit the VDOC to, and the VDOC did not, reduce already applied or vested sentence credits.

In fact, the 2020 Amendment did not "effectively lengthen[] [Dudley's] sentence and . . . increase [his] punishment[,]" as he argues. Dkt. 2 at 10. Instead, the amendment brought about no change on Dudley's ability to earn ESCs on his sentence for the first-degree murder conviction. However, Dudley will possibly earn more enhanced ESCs on his sentence for the concealment of a dead body conviction. Because Dudley is to serve his sentences for first-degree murder and for concealment of a dead body consecutively, Dudley has been satisfying his active 32-year sentence for first-degree murder since May 17, 2011. Before July 1, 2022, Dudley could earn no more than 4.5 days credit per 30 days served on both sentences. During the two-year period that followed—when the limiting language of the budget provision was in effect—Dudley, still serving his first-

degree murder sentence, could have earned no more than 4.5 days credit per 30 days served because first-degree murder is an enumerated subsection (A) offense, and thus Dudley was not eligible to earn enhanced ESCs that otherwise would have been available for the concealment of a dead body conviction. But two years later, the budget provision expired. Under the ESC system as the statute reads now, Dudley is able to earn: (a) no more than 4.5 days credit per 30 days served for his sentence on the first-degree murder conviction (the same amount and rate he was entitled to before July 1, 2022); and (b) the enhanced ESCs, up to 15 days credit per 30 days served for his sentence on the concealment of a dead body conviction (which was previously limited to 4.5 days per 30 days served). Va. Code Ann. § 53.1-202.3.

### D. Eighth Amendment

Lastly, the Court rejects Dudley's argument that "[r]equiring [him] to serve that portion of [his] sentence that should be reduced in the same manner as those other offenders" violates the Eighth Amendment's prohibition of cruel and unusual punishment. Dkt. 2 at 13. Dudley seemingly argues that his incarceration past some unknown point in the future—beginning when he would otherwise be released if he was entitled to receive, and did in fact receive, the enhanced ESCs provided for in subsection (B) for his first-degree murder conviction—constitutes cruel and unusual punishment. "In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that the deprivation of [a] basic human need was objectively sufficiently serious, and that subjectively the officials act[ed] with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (internal quotation marks and citations omitted). "[T]o demonstrate that a deprivation is extreme enough to satisfy the objective component of an Eighth Amendment claim, a prisoner must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Id.*

Again, beyond the blanket assertion that the 2020 amendment violates his Eighth Amendment rights, Dudley provides no support, either factual or legal, for that assertion. Dudley neither alleges that he is being held in excess of the total sentence imposed by the sentencing court, nor does he plead any facts that would show that he has suffered the requisite level of injury. Further, Dudley does not allege that anyone, possessed a "sufficiently culpable state of mind[,]" *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). It can hardly be said that serving a lawfully imposed and correctly calculated sentence is "cruel and unusual."

## V. Conclusion

Accordingly, for the foregoing reasons, Respondent's Motion to Dismiss, Dkt. 14, must be granted, and the petition will be dismissed by an order to be issued alongside this Memorandum Opinion.[10]

Entered this ___4___ day of ___June___, 2025

Alexandria, Virginia

/s/
Rossie D. Alston, Jr.
United States District Judge

---

[10] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner fails to meet this standard.

17